# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : 3:17-CR-326 |
| | : (JUDGE MARIANI) |
| OMAR SANTIAGO-MUNIZ, | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant, Omar Santiago-Muniz, is charged with sexual exploitation and attempted sexual exploitation of a child, 18 U.S.C. §§ 2251(a) and (e), enticement of a minor to engage in sexual activity for which any person could be charged with a crime, 18 U.S.C. § 2422(b), and the transfer of obscene material to minors, 18 U.S.C. § 1470. (Doc. 1). Presently before the Court is Defendant's Motion to Suppress Statements. (Doc. 34). Through this Motion, Defendant seeks to suppress statements he made to Pennsylvania State Troopers on July 21, 2017, on the basis that the statements were obtained in violation of Defendant's Fourth and Fifth Amendment rights. The Court held an evidentiary hearing on June 28, 2018. For the reasons that follow, the Court will deny Defendant's Motion.

### II. FINDING OF FACTS

At approximately 10:30 a.m. on July 21, 2017, Pennsylvania State Police executed a search warrant on Defendant's second floor apartment in Pottstown, Pennsylvania. (June 28, 2018, Hr'g Tr., Doc. 46 at 4-6, 29). At that time, Defendant was in the apartment with

his girlfriend, Jennifer Quach, and her brother, Stephen Quach. (*Id.* at 6). After the Troopers knocked on the front door and announced their presence, either Defendant or Ms. Quach answered the door. (*Id.* at 31). Six or seven Troopers then entered the apartment, at least some of whom had their guns drawn. (*Id.* at 5, 7, 32-33, 59, 64). The three individuals in the house were frisked. (*Id.* at 33). After the Troopers were satisfied that the apartment was secure, they holstered their weapons. (*Id.* at 7, 65).

Trooper Anthony Reppert then approached Defendant, Ms. Quach, and Mr. Quach, who were seated on the living room sofa. (*Id.* at 7). After obtaining some basic biographical data from the three and informing them that the Troopers were conducting a computer-related investigation into crime committed over the internet, Trooper Reppert asked if Defendant would be willing to speak with the Trooper at the dining room table. (*Id.* at 8, 11). Defendant agreed and walked over to the dining room table with Trooper Reppert and Corporal Michael Fegley. (*Id.* at 8). The dining room was adjacent to the living room and Defendant sat down in a seat that had a view of the living room. (*Id.* at 9-10, 34-35). Trooper Reppert told Defendant that he was not under arrest, that he was free to leave, and that he was not required to speak to the Troopers. (*Id.* at 9, 39, 56, 66). Defendant agreed to answer questions and assist in the investigation. (*Id.* at 9-10). Defendant was not advised of his *Miranda* rights. (*Id.* at 39).

Trooper Reppert began asking Defendant some questions while four other Troopers searched the apartment. (*Id.* at 9). Trooper Reppert described the tone of the questioning

2

as calm, respectful, and serious. (*Id.* at 10, 17). Similarly, Sergeant John O'Neill described the tone as non-hostile and Corporal Fegley stated that the questioning was serious, calm, and direct. (*Id.* at 55, 68). During the course of the questioning, no one shouted or screamed at Defendant, no one told Defendant he could not leave, and no one handcuffed or physically restrained Defendant in any way. (*Id.* at 10, 13, 20, 55, 68-69). Up until the end of the interview, Defendant never asked to stop answering questions. (*Id.* at 15, 20, 57). Defendant took two different breaks, once to use the bathroom and once for water. (*Id.* at 13). During the first break, a Trooper escorted Defendant to the bathroom and remained outside the partially open door. (*Id.* at 14, 43-44).

When the questioning started, Ms. Quach and Mr. Quach remained seated in the living room. (*Id.* at 14). Sometime within the first hour after the Troopers arrived, Ms. Quach asked if she and her brother could leave the apartment and were told they were free to do so. (*Id.* at 15, 42, 66-67). They then went outside.[1] (*Id.* at 15, 66-67). At some point Defendant's father, Luis Santiago, arrived at the house, brought groceries into the kitchen, put them away, and was then told he could leave or step out onto the balcony. (*Id.* at 16-17,

---

[1] Contrary to Sergeant O'Neill's testimony that Ms. Quach asked to leave the house and was told she was free to do so, (June 28, 2018, Hr'g Tr., Doc. 46 at 66-67), Ms. Quach testified that she did not ask to leave but was instead ordered out of the house by the Troopers. (*Id.* at 86-87). Nevertheless, the Court finds that Ms. Quach was not a credible witness because a key portion of her testimony was contradicted by every other witness who testified on that same point. Specifically, Trooper Reppert, Trooper Dawe, and Defendant's father, Luis Santiago, all testified that, after Luis Santiago arrived at the house in the midst of the questioning, he went inside the house and then waited on the second floor balcony with Trooper Dawe until the questioning was over. (*Id.* at 16-17, 76, 80). Contrary to this uniform testimony, Ms. Quach testified that the Troopers let Luis Santiago inside the house but then immediately brought him back downstairs and out in front of the house. (*Id.* at 89). When questioned further on cross examination, Ms. Quach testified that she was as certain of that point as she was that she was ordered out of the house. (*Id.* at 89-90).

3

45, 78, 80). He asked if he could speak with his son, but was told that he could not until the interview was over. (*Id.* at 78, 80, 82). Luis Santiago remained out on the balcony with a Trooper until the end of the questioning. (*Id.* at 17, 76).

For the first hour and ten minutes of questioning, Defendant talked with Trooper Reppert and Corporal Fegley. (*Id.* at 10). Defendant denied using any Facebook accounts and offered some explanations of who might have used his internet account. (*Id.* at 11-12, 20). Sergeant O'Neill then joined the interview after he received some information from the Kentucky State Police about an investigation they were conducting that implicated Defendant. (*Id.* at 15-16, 67-68). Sergeant O'Neil produced a picture of Defendant that the Kentucky State Police had provided and which had been sent to a minor in Kentucky. (*Id.* at 17, 49). Defendant then gradually began to admit using Facebook accounts, including the accounts that the Troopers believed were used to contact minors. (*Id.* at 18, 52). Defendant also admitted that he had online conversations with minors that were sexual in nature. (*Id.* at 52).

Trooper Reppert eventually asked Defendant to write out a written statement concerning what they had talked about. (*Id.* at 19). Defendant then asked to see the search warrant and asked if the crime the Troopers were investigating was a felony. (*Id.*). After he was shown the front page of the warrant and told that the investigation involved a felony, Defendant stated that he did not want to fill out a written statement and that he wanted to talk with an attorney. (*Id.* at 19-20, 58). After that point, no more questions were

4

asked and Defendant was placed under arrest. (*Id.* at 20, 40, 57). The entire period of questioning lasted approximately two hours and forty minutes. (*Id.* at 13).

### III. DISCUSSION

Defendant argues that the statements he made to the Pennsylvania State Troopers at his house on July 21, 2017, should be suppressed pursuant to the Fifth Amendment because the Troopers subjected Defendant to a custodial interrogation without first advising him of his *Miranda* rights and obtaining a waiver. The Government's position is that Defendant was not in police custody at the time of questioning and thus the Troopers were not required to advise Defendant of his *Miranda* rights.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). In an effort to ensure these rights are protected, the United States Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

5

privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as "*Miranda* rights" or "*Miranda* warnings," a defendant in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

Implicit in the above is that "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). Instead, "*Miranda* . . . requires warnings only when the person the police are questioning is in custody." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). Stated otherwise, "[n]o *Miranda* warning is required absent a 'custodial interrogation.'" *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009); *see also Miranda*, 384 U.S. at 444. "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.

6

Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted). Here, the parties do not dispute that the interview that took place between the State Troopers and Defendant satisfied the interrogation prong of the custodial interrogation analysis. Thus, the only question before the Court is whether Defendant was in custody when he was interrogated by the State Police.

"As used in . . . *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). A person is in custody for purposes of *Miranda* when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495); *see also Willaman*, 437 F.3d at 359. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (footnote omitted). Further, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

"[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974); *see also Willaman*, 437 F.3d at 359; *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). Nevertheless, while the term "'custody' must not be read too broadly," it is "beyond doubt that a custodial interrogation may occur outside the police station." *Leese*, 176 F.3d at 743.

The Third Circuit has identified five factors a court must consider when determining whether a person was in custody for purposes of *Miranda*:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60; *see also United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).[2]

---

[2] Both parties agree that the test articulated in *Willaman* and *King* is the proper standard to be applied. (Doc. 34-1 at 3; Doc. 37 at 10). Nevertheless, in *Howes v. Fields*, the Supreme Court observed that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda* . . . [and] 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.'" *Howes*, 565 U.S. at 509 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010)). As such, *Howes* instructs that a court, after determining whether a person questioned by police was objectively free to leave, must then consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

Upon careful consideration, the Court finds that *Howes* does not fundamentally alter the test for custody that was articulated in *Willaman* and *King*. First, *Howes* was a habeas action reviewing a determination by the Sixth Circuit that it was "clearly establish[ed] that a prisoner is in custody within the meaning of *Miranda* . . . if the prisoner is taken aside and questioned about events that occurred outside the prison walls." *Howes*, 565 U.S. at 502. The Supreme Court reversed, holding that "[o]ur decisions . . .

Here, there is no dispute that Defendant was not advised of his *Miranda* rights before he was questioned by the Troopers. Nevertheless, upon consideration of the above factors, the Court finds that Defendant was not in custody at the time of questioning and therefore *Miranda* was not implicated.

As Defendant concedes, the first factor favors the Government's position. (Doc. 34-1 at 3). At the hearing there was uncontroverted testimony that, before any questioning took place, Trooper Reppert told Defendant that Defendant was not under arrest, that he was free to leave, and that he did not need to answer any questions. Thus, this factor suggests Defendant was not in custody.[3]

Next, the second factor—the location of the interrogation—neither indicates that Defendant was in custody nor indicates that he was not in custody. On one hand, Defendant was questioned in his home, his girlfriend and her brother remained nearby and

---

do not clearly establish such a rule, and therefore the Court of Appeals erred in holding that this rule provides a permissible basis for federal habeas relief under the relevant provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1)." *Id.* Thus, the Court's general pronouncements discussed above were not ultimately necessary for its holdings and are therefore dicta. Second, the test as articulated in *Willaman* and *King* bear on whether a person is in custody for purposes of *Miranda*. The factors that a district court must consider concern both whether an individual is free to leave and whether the circumstances of the interrogation create the type of coercive atmosphere for which *Miranda* was meant to address. Thus, although formulated differently, the Court finds no practical difference between the test articulated in *Howes* and the test articulated in *Willaman* and *King*.

[3] Although Defendant conceded this point in his initial brief, in his brief filed after the evidentiary hearing Defendant argues that this factor weighs in his favor because of the conduct of the Troopers in Defendant's home. (Doc. 47 at 2-5). The first factor as articulated in *Willaman* and *King* is "whether the officers told the suspect he was under arrest or free to leave." *Willaman*, 437 F.3d at 359; *King*, 604 F.3d at 138. Because Trooper Reppert told Defendant that he was not under arrest, that he was free to leave, and that he did not have to answer any of the Trooper's questions, this factor favors a finding that Defendant was not in custody. The question of whether the Troopers' other conduct outweighs this factor is a separate inquiry that will be addressed in the context of the other four factors.

in Defendant's view until they requested to leave the apartment, and Defendant's father entered the house during the questioning and stood nearby putting away groceries. *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) ("[T]he fact that the incident took place in Appellee's home undermines a claim that he was in custody"); *United States v. Vidal*, 85 F. App'x 858, 861-62 (3d Cir. 2004) (holding that a defendant was not in custody when he was questioned in his home and his family remained in the house); *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation" (internal citation and quotation marks omitted)).

On the other hand, there were multiple State Troopers walking throughout the apartment and questioning Defendant, everyone in the apartment had a police escort, and Defendant's father was not allowed to remain in the apartment or speak with Defendant. *See United States v. Fautz*, 812 F. Supp. 2d 570, 619 (D.N.J. 2011) (finding a defendant was in custody when he was questioned in "his own home, but at that time the entire premises was visibly subject to the unquestioned command of the officers"). Taken together, the Court finds that this factor favors neither Defendant's position nor the Government's position.

Defendant, however, suggests that the facts of this case are analogous to *United States v. Mittel-Carey*, 493 F.3d 36 (1st Cir. 2007). In *Mittel-Carey*, the First Circuit found

that a defendant was in custody for purposes of *Miranda* despite the fact that agents questioned the defendant in his home. The Court found the following facts important in reaching its decision:

> (1) the early hour of the search and interrogation (6:25 AM); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant *Miranda* warnings.

*Mittel-Carey*, 493 F.3d at 40. Most important to the Court's holding was "the level of physical control that the agents exercised over the defendant during the search and interrogation." *Id*. The defendant "was ordered to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom." *Id*. Thus, the Court held that "[w]hile an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody . . . the level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home." *Id*.

While the case at hand shares some superficial similarities, many of the facts key to *Mittel-Carey*'s holding are absent. Specifically, the search in this case did not occur early in the morning, the Troopers first encountered Defendant at his front door or in his living room,

11

and Defendant was specifically told he was not under arrest and was free to leave. With respect to the environment of the questioning, Defendant was not ordered to go anywhere or told where to sit, his girlfriend and her brother remained nearby until they decided to leave the apartment, and Defendant's father entered the house during the questioning and put away groceries nearby. Thus, the Court does not find that *Mittel-Carey* has much persuasive value when applied to the facts of this case.

Defendant also relies on *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). In that case, the Ninth Circuit found that questioning that took place in a suspect's home amounted to a custodial interrogation because law enforcement agents created a police dominated atmosphere. While some of the broader pronouncements in *Craighead* appear to support Defendant's position, the actual facts the Circuit relied on in reaching its conclusion are dispositively different from the case at hand.

Specifically, the Ninth Circuit explained that agents escorted Craighead "to a back storage room and the door was closed behind him." *Id.* at 1085. Craighead testified that an officer "appeared to him to be leaning with his back to the door in such a way as to block Craighead's exit from the room." *Id.* "Craighead testified that he did not feel he had the freedom to leave the storage room because, in order to get to the room's only door, he 'would have either had to have moved the police detective or asked him to move.'" *Id.* Although one officer told Craighead that he was free to leave, "Craighead testified that the presence of agents from three different law enforcement agencies left him with doubt as to

whether [the officer] had the authority to pronounce him free to leave." *Id.* at 1088. "He believed that even if the FBI permitted him to leave the storage room, he might be confronted by members of the other two agencies and forbidden to leave the house." *Id.* As none of the above facts are present in this case, *Craighead* provides the Court no assistance in resolving Defendant's Motion.[4]

Turning to the third factor—the length of the interrogation—"courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial." *Killingsworth*, 118 F. App'x at 651-52 (citing cases). While the Court does not view two hour and forty minute of questioning as inconsequential, the case law in this circuit does not support the proposition that the length of the interrogation in this case supports a finding that Defendant was in custody. *See, e.g., United States v. McKinney*, 695 F. Supp. 2d 182, 191 (E.D. Pa. 2010) ("[T]he Court notes that the length of time of the search—nearly five hours—weighs slightly in favor of a finding of custody"). At best, this factor benefits neither party's position. *See United States v. Griffin*, 922 F.2d 1343, 1348-49 (8th Cir.1990) ("The length of the interrogation has been a similarly undeterminative factor in the analysis of custody") (citing cases).

Next, the Court finds that the fourth factor—whether the police use coercive tactics—indicates that Defendant was not in custody. In particular, the tone of the questioning was

---

[4] Defendant's citation to *United States v. Taylor*, 22 F. Supp. 3d 387 (M.D. Pa. 2014), is similarly unhelpful. In that case, the Court found that the second *Willaman* factor was "[a]t best . . . neutral" when the defendant was questioned while he "was laying down in the upstairs bedroom experiencing severe pain and was unable to move for the duration of the questioning," and "his family and friends were not present in the room to offer moral support." *Id.* at 391-92.

not hostile, but was instead serious, calm, and respectful. No one yelled at or threatened Defendant. He was not physically restrained in any way during the questioning. Although some of the Troopers had their weapons drawn when entering the house, the guns were holstered before the questioning at the dining room table began. Thus, on a whole, this factor supports the Government's position. See *Killingsworth*, 118 F. App'x at 652.

Defendant, however, argues that several factors indicate that the Troopers used coercive tactics. First, Defendant asserts that the Troopers confronted Defendant with evidence against him and accused him of wrongdoing. (Doc. 34-1 at 6-7; Doc. 47 at 9-10). On cross-examination, Sergeant O'Neill's described the interaction as follows:

> Q. And you show my client the photograph of himself that had been sent to an underage girl in Kentucky?
>
> A. Yes, sir.
>
> Q. What did you say?
>
> A. Well, it was a general conversation about the investigation. He was denying any involvement with any communication, at that point.
>
> Q. You said you didn't believe him, because you've got a photograph of him to some girl in Kentucky; right?
>
> A. Yes, we would have advised that was inconsistent.
>
> Q. It's only after you show him that photograph that he starts to make any admissions to using these Facebook accounts?
>
> A. Initially, he said we could have gotten that picture anywhere on the internet, so he didn't, but as the conversation went on, yes, then he started to.
>
> Q. Because you tell him you don't believe him; right?

> A. Well, we would say -- we would go over the points that we have and say -- yes -- it seems inconsistent with what you're telling us, so yeah.
>
> Q. You're telling him –
>
> A. I don't know what my exact words were, but, yes, in that regard, we would have said it seems inconsistent with what you're telling us.

(June 28, 2018, Hr'g Tr., Doc. 46 at 72-73). This type of questioning does not rise to the level of being a "coercive tactic." See Taylor, 22 F. Supp. 3d at 392 (finding no evidence of coercive tactics even though officers "did ask Defendant confrontational questions");

Second, Defendant argues that the Troopers positioned themselves between Defendant and the exits. (Doc. 47 at 9). Trooper Reppert's uncontroverted testimony on the topic establishes that although Sergeant O'Neill was in Defendant's line of sight if Defendant were to look at the door, Defendant could have gotten up and walked to the door without any of the Troopers needing to move. (June 28, 2018, Hr'g Tr., Doc. 46 at 48-49). Thus, Sergeant O'Neill position in the room did not impact Defendant's ability to leave the encounter.

Third, Defendant contends that his freedom of movement was restricted because a Trooper escorted Defendant to the bathroom. (Doc. 34-1 at 7; Doc. 47 at 9-10). Trooper Reppert testified that Defendant was escorted to the bathroom and not allowed to close the door for safety reasons and to prevent the potential destruction of evidence. (June 28, 2018, Hr'g Tr., Doc. 46 at 14). While the escort of Defendant in his home is a somewhat coercive tactic, that fact alone does "not convert the questioning into a custodial

15

interrogation." *McKinney*, 695 F. Supp. 2d at 192. Accordingly, the Court finds that on balance the fourth factor indicates that Defendant was not in custody.[5]

The fifth factor—whether Defendant voluntarily submitted to questioning—also supports a finding that Defendant was not in custody. After being told that he was not required to answer any questions, Defendant agreed to talk with Trooper Reppert and assist in the investigation. At no point prior to the interview ending did Defendant asked to stop answering questions. Finally, when Defendant did eventually tell the Troopers that he did not want to answer any more questions, all questioning ceased. Thus, the Court finds that this factor supports the Government's position. *See Killingsworth*, 118 F. App'x at 652 (holding that the fifth factor supported a finding that the defendant was not in custody when "[n]othing indicate[d] that the incident involved the type of physical intimidation or psychological coercion which would render Appellee's statements involuntary").

Finally, Defendant devotes a portion of his brief to arguing that, in addition to the *Willaman* factors, the Court should consider the fact that the Troopers' prime suspect at the time of questioning was Defendant. (Doc. 47 at 11-13). Defendant is correct that "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325. Nevertheless, "[t]hose beliefs are relevant only to the extent they would affect how a

---

[5] Defendant also argues that the State Police isolated Defendant by removing his friends and family. (Doc. 34-1 at 7; Doc. 47 at 9). As already discussed, the credible evidence in the record indicates that Ms. Quach and Mr. Quach remained in the apartment for some time before they themselves choose to leave.

reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.* Thus, an officer's subjective beliefs about a suspect's guilt are only relevant when the "beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.*

Here, other than the manner of questioning—which this Court already addressed above—Defendant cites to no evidence in the record that any Trooper's subjective view that Defendant committed the crime under investigation was communicated to Defendant in such a way as to impact whether a reasonable person in Defendant's position would feel free to leave. Instead, Defendant baldly asserts that "the subjective beliefs of the troopers were *likely* manifested in their behavior during the interrogation." (Doc. 47 at 13) (emphasis added). However likely it was that the Troopers' behavior was impacted by such belief of Defendant's guilt as they may have had, the Court has not been made aware of any evidence in the record that the Troopers conducted themselves in such a manner as to communicate to Defendant that he was not free to end the questioning and leave. *See Steigler,* 496 F.2d at 799.

Considering the totality of the circumstances, the questioning of Defendant in his home on July 21, 2017, did not create the type of inherently coercive environment for which *Miranda* was meant to address. Instead, based upon the balance of the factors discussed above, the Court holds that Defendant was not in custody for *Miranda* purposes at the time of questioning and that the Troopers were therefore not required to advise Defendant of his *Miranda* rights prior to questioning him. Accordingly, Defendant's statements were not taken in violation of his Fifth Amendment rights and are therefore not subject to suppression.[6]

## IV. CONCLUSION

For the reasons outlined above, the Court will deny Defendant's Motion to Suppress. A separate Order follows.

---

[6] In his initial brief, Defendant also argued that he was unlawfully seized during the questioning in violation of the Fourth Amendment. (Doc. 34-1 at 9-11). However, Defendant appeared to have since abandoned this argument, as he made no reference to it at the evidentiary hearing, nor raised the argument in his subsequent brief after the hearing. In any event, Defendant's Fourth Amendment argument independently fails, since officers executing a search warrant are permitted "to detain the occupants of the premises while a proper search is conducted." *Bailey v. United States*, 568 U.S. 186, 193, 133 S. Ct. 1031, 1037-38, 185 L. Ed. 2d 19 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). "An officer's authority to detain incident to a search is *categorical*; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* (quoting *Muehler v. Mena*, 544 U.S. 93 (2005) (emphasis added). The *Summers* rule allows detention incident to the execution of a search warrant "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Id.* (quoting *Muehler*, 544 U.S. at 98). Defendant's citation to *Leveto v. Lapina* is unavailing, as that case involved a detention incident to the execution of a search warrant that lasted a total of *eight hours*, involved forced relocation of the defendant, and ended with detaining the defendant in "a closed a closed room for approximately six hours" after the final relocation. 258 F.3d 156, 160 (3d Cir. 2001). *Compare Muehler*, 544 U.S. at 100 (upholding a 2 to 3 hour detention of defendant in handcuffs during execution of a search warrant as reasonable).

Robert D. Mariani
United States District Judge